IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 3:18-mj-00464-DMS |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| MAY SAELEE AND CHER VANG | ) | |
| | ) | |
| Defendant(s) | ) | |
| | ) | |
| | ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I Ricky A. Pawlak, being first duly sworn upon oath, hereby depose and states as follows:

### BACKGROUND AND EXPERIENCE OF AFFIANT

1. I have been employed as an Alaska State Trooper since September 1998.

2. In November of 2006, I was assigned as a Task Force Officer to the Drug Enforcement Administration's (DEA) Airport Drug Interdiction Detail and have been deputized as a Federal Officer during this assignment.

3. I have received classroom instruction and field training in narcotics investigation while at the Alaska State Troopers Academy, during my tenure as a State Trooper, and since my assignment with the DEA Drug Interdiction Task Force. That training consisted of Alaska Law on controlled substances, investigative techniques, search warrant and glass warrant applications and service, surveillance techniques both mobile and static, handling of confidential and citizen informants, and paid special agents. I also received training in the testing and identification of controlled substances as well as proper evidence handling techniques.

4. On March 2002 I became a certified Alaska State Trooper K9 handler in both scent detection and patrol applications. Since that time, I have continuously handled scent detection canines and have maintained certifications with the Alaska State Troopers.

AUG 3 0 2018

5. During my tenure as a State Trooper, I have conducted and/or participated in numerous investigations relating to the use, possession, manufacture, and trafficking of controlled substances, and I have become familiar with devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances. I have also conducted and/or participated in investigations which have resulted in the seizure of marijuana, marijuana grow operations, cocaine hydrochloride, cocaine base (crack cocaine), opium, heroin, methamphetamine, methlenedioxymethamphetamine (MDMA/ecstasy), prescription medications, firearms, cellular phones, surveillance systems, cameras, memory cards, computers, documents, money, and precious metals. I have also conducted numerous interviews of people involved in the use, possession, manufacture, and trafficking of controlled substances which have added to my knowledge of the illegal drug culture that exists in the Anchorage, Alaska area. In addition to my formal training and experience, I have gained knowledge and insight by working and speaking with many experienced law enforcement agents/officers from local, state, and federal agencies, and I consider this knowledge and insight to be an integral part of my experience and training.

6. Pursuant to my background, training, and experience, as well as the training and experience of other law enforcement personnel with whom I have consulted regarding this case, investigation of this case has shown that:

## PURPOSE OF AFFIDAVIT

7. This affidavit is made in support of a criminal complaint against and arrest warrant for May Saelee and Cher Vang for the violation of Title 21 U.S.C. Section 841(a)(1) {Dispense or Possess with Intent to Distribute Methamphetamine} and 846 {Conspiracy to Distribute Methamphetamine}.

8. The information contained below is from my personal knowledge, from other law enforcement agents and officers, or from specific sources as set forth. It does not include all the information known to me as part of this investigation, but only information sufficient to establish probable cause.

AUG 3 0 2018

## FACTS SUPPORTING PROBABLE CAUSE
### Cooperator Statements
### Cooperating Source

9.  Cooperating Source (hereinafter CS) was pronounced Guilty of :

    A) Violation of Conditions of Release

    B) Driving with License Revoked/Suspended

    C) Operate Vehicle Under the Influence of Alcohol/Drugs

    D) Violate Conditions of Release

    E) Reckless Driving. The CS has no prior felony convictions, nor any for crimes involving dishonesty. The CS currently has neither state nor federal charges pending. The CS has not received any compensation from the investigating agencies identified below specifically as a reward for cooperation or information. The CS has received compensation for her assistance.

10. Unsolicited, in 2017, the CS arrived at the Anchorage District Office and met with TFO Pawlak, TFO Miner, and SA Olsen. The CS stated (s)he came forward because (s)he was tired of seeing people's lives ruined because of drugs and felt (s)he could do something that no one else would or could do. The CS stated (s)he had been involved in dealing methamphetamine which (s)he initially received from "Spud" but then got through Spud's wife, May Saelee. The CS was shown a photo lineup consisting of 6 photos and the CS identified Cher Vang as "Spud". The CS was shown a photo lineup consisting of 6 photos and the CS identified May Saelee as "Spud's" wife. According to the CS, May Saelee was the head of the organization and was referred to as "The First Lady". The CS rode as a passenger and showed TFO Pawlak and TFO Miner addresses where the CS previously obtained methamphetamine from Saelee, one of those addresses being 2240 Banbury Drive Anchorage, the residence of Cher Vang and May Saelee and 235 North Bliss/ 4602 Mountain View Drive, Anchorage, AK, what the CS described as "The Poker House".

11. According to records from the Municipality of Anchorage, May Saelee owns both properties.



## PROBABLE CAUSE

12. On or before July 31, 2017 through August 2, 2018, Cher Vang conspired with May Saelee to possess and distribute over 50 grams of actual methamphetamine.

13. Law Enforcement conducted four controlled purchases of methamphetamine involving the CS, May Saelee, and Cher Vang. Two of the four purchases were made directly from Cher Vang and the other two from May Saelee.

14. During the first controlled purchase, the CS contacted Saelee and arranged to purchase an ounce of methamphetamine for $800.00. Saelee informed the CS to meet "Spud" (Cher Vang) at the spot, known to the CS as referring to the "Poker House". When the CS met with Vang, he asked the CS how much did May say? and the CS replied eight. Vang removed the methamphetamine from his pants pocket, took the pre-recorded $800.00 from the CS, and placed the money in his pocket. The methamphetamine was later determined to be 99% pure and had an official actual weight of 27.617 grams by the DEA Western Regional Laboratory.

15. During the second controlled purchase, the CS arranged to purchase four ounces of methamphetamine from Saelee for $800.00 per ounce. The CS arrived at the Poker House and again met with Vang at one of the out buildings. Vang asked the CS, "3200?" The CS provided Vang with $3,200.00 in pre-recorded funds and Vang provided the CS with the methamphetamine. The methamphetamine was determined to be 98% pure and had an official actual weight of 109.2 grams by the Western Regional Laboratory.

16. During the third controlled purchase, the CS arranged to purchase another four ounces of methamphetamine from May Saelee. The CS met Saelee at the Poker House and provided Saelee payment for which the CS received the methamphetamine. The methamphetamine

AUG 3 0 2018

was determined to be 99% pure and had an official actual weight of 110.2 grams by the Western Regional Laboratory.

17. During the fourth controlled purchase, the CS arranged to purchase six ounces of methamphetamine from May Saelee. Following the telephone call, TFO Miner observed May Saelee and Cher Vang arrive at the Poker House. TFO Miner observed Saelee enter their 2010 Itasca motorhome and observed Vang go to the side of the motorhome, out of TFO Miner's view, then joining Saelee in the motorhome. Upon the CS's arrival, Saelee exited the motorhome with the methamphetamine in hand and both she and the CS entered the Poker House. The CS provided Saelee with $4,800.00 and Saelee provided the CS with the methamphetamine. Saelee returned to the motorhome with the cash and the CS departed. The methamphetamine was noted to smell of fuel. The methamphetamine was determined to be 97% pure and had an official actual weight of 161.3 grams by the Western Regional Laboratory.

//

//

//

//

//

//

//

//

//



AUG 3 0 2018

18. Based on the foregoing, your Affiant submits that May Saelee and Cher Vang conspired with each other and others to distribute and to possess with intent to distribute 50 grams or more of actual methamphetamine in violation of Title 21 U.S.C. Section 846(a)(1) and 841(a)(1) and (b)(1)(A).

Further your Affiant sayeth not.

DATED at Anchorage, Alaska, this ___30___ day of August, 2018.

**Signature Redacted**

Rick Pawlak, Task Force Officer
Drug Enforcement Administration

SUBSCRIBED AND SWORN to before me this ___30___ day of ___August___, 2018.

/S/ DEBORAH M. SMITH
CHIEF U.S. MAGISTRATE JUDGE
SIGNATURE REDACTED

United

AUG 3 0 2018